## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

------------------------------------------------------------

LEZLIE BUTTON,

       *Plaintiff,*

    v.

NEW YORK STATE DEPARTMENT OF
TRANSPORTATION,

       *Defendant.*

------------------------------------------------------------

**Civ. No. 6:24-cv-06739- EAW**

**AMENDED COMPLAINT**

Plaintiff LEZLIE BUTTON, by and through her undersigned counsel, EISENBERG & BAUM, LLP, hereby states her First Amended Complaint against Defendant NEW YORK STATE DEPARTMENT OF TRANSPORTATION ("NYSDOT"):

### INTRODUCTION

1. This is an action for declaratory, injunctive, and monetary relief to redress Defendant's unlawful discrimination and retaliation against Plaintiff on the basis of her disability, in violation of Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act" or "Section 504"), 29 U.S.C. § 794, and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 et seq.

2. Plaintiff Lezlie Button is Deaf and communicates primarily in American Sign Language ("ASL"). She has been employed by the New York State Department of Transportation ("NYSDOT") since 2006 as an Engineering Technician. For over six years, NYSDOT has systematically denied Ms. Button qualified ASL interpreters, subjected her to functionally inadequate communication tools that federal regulators have declared improper for in-person use, denied her promotions based on performance evaluations tainted by the very accommodation

failures NYSDOT caused, demoted her from a Senior Engineering Technician position, and retaliated against her for asserting her rights to equal access.

3. NYSDOT receives billions of dollars annually in federal financial assistance through the Federal Highway Administration, Federal Transit Administration, and National Highway Traffic Safety Administration. As a condition of accepting those funds, NYSDOT is bound by the nondiscrimination requirements of Section 504 and its implementing regulations, including the obligation to provide effective communication and reasonable accommodations to qualified employees with disabilities.

4. Plaintiff seeks to compel Defendant to cease its unlawful discriminatory practices, implement effective policies to prevent disability discrimination, provide reasonable accommodations as required by law, and compensate her for the damages she has suffered.

## **PARTIES**

5. Plaintiff Lezlie Button is Deaf and communicates primarily in American Sign Language. She is substantially limited in the major life activities of hearing and speaking within the meaning of 29 U.S.C. § 705(9)(B) and 42 U.S.C. § 12102(2). She currently resides in West Henrietta, Monroe County, New York.

6. Defendant New York State Department of Transportation is a department of the New York State government, with its principal place of business at 50 Wolf Road, Albany, New York 12232. Defendant has a registered address for service c/o Attorney General, The Capitol, Albany, New York 12224-0341.

7. At all times relevant to this action, NYSDOT has been a recipient of federal financial assistance within the meaning of 29 U.S.C. § 794(b). Specifically, NYSDOT receives

2

approximately $2.7 to $2.9 billion annually in formula funds from the Federal Highway Administration ("FHWA") under the Infrastructure Investment and Jobs Act, Pub. L. 117-58, including funds under the National Highway Performance Program, Surface Transportation Block Grant Program, Highway Safety Improvement Program, and Bridge Formula Program, among others.

8. NYSDOT additionally receives federal financial assistance from the Federal Transit Administration ("FTA") as the designated recipient of Section 5311 (Rural Area Formula Grants) and Section 5310 (Enhanced Mobility of Seniors and Individuals with Disabilities) funds, and from the National Highway Traffic Safety Administration ("NHTSA") through Section 402 State and Community Highway Safety Grants.

9. NYSDOT's own official documents confirm its status as a recipient of federal financial assistance. NYSDOT's Civil Rights Policy Statement acknowledges compliance with "Section 504 of the Rehabilitation Act of 1973." NYSDOT's Title VI program documentation defines NYSDOT as "an entity or entities that directly receive federal financial assistance from the United States Department of Transportation (USDOT) through the Federal Highway Administration (FHWA)." Pursuant to the Civil Rights Restoration Act of 1987, Pub. L. 100-259, Section 504's nondiscrimination requirements extend to all of NYSDOT's programs and activities, including its employment practices, because NYSDOT receives federal funds.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over Plaintiff's Section 504 claims under 28 U.S.C. §§ 1331 and 1343 because this action arises under the laws of the United States. This Court

has supplemental jurisdiction over Plaintiff's NYSHRL claims under 28 U.S.C. § 1367 because those claims form part of the same case or controversy as the federal claims.

11. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims occurred in Monroe County and the surrounding NYSDOT Region 4 area within this District.

12. Pursuant to 42 U.S.C. § 2000d-7(a)(1), a State that receives federal financial assistance shall not be immune under the Eleventh Amendment from suit in federal court for a violation of Section 504 of the Rehabilitation Act of 1973. By accepting federal financial assistance as alleged in Paragraphs 7 through 9 above, Defendant is subject to suit in this Court and to all remedies available against any public or private entity for violations of Section 504. 42 U.S.C. § 2000d-7(a)(2).

## ADMINISTRATIVE PROCEEDINGS

13. On August 16, 2023, Plaintiff filed a Charge of Discrimination (#525-2023-01335) with the Equal Employment Opportunity Commission ("EEOC"), Buffalo Local Office, alleging discrimination on the basis of disability, sex, and age against NYSDOT.

14. In accordance with standard EEOC procedures for charges alleging disability discrimination against state government entities, the EEOC referred Plaintiff's disability discrimination allegations to the United States Department of Justice, Civil Rights Division, for processing.

15. Section 504 claims do not require exhaustion of EEOC administrative remedies. The private right of action under Section 504 is independent of the EEOC process.

## STATEMENT OF FACTS

*To the extent any of Plaintiff's allegations involve conduct occurring outside the applicable limitations period, such allegations are included as background evidence to establish Defendant's notice, motive, and discriminatory intent, and to provide necessary context for the continuous and ongoing nature of the discriminatory environment. Plaintiff further asserts that these incidents constitute a continuing violation, as the failures to provide effective communication and the resulting adverse career impacts occurred continuously and without interruption from 2018 through the present*

### A. Plaintiff's Professional Background and Qualifications

16. Lezlie Button is a Deaf woman whose primary and preferred language is American Sign Language (ASL).

17. In December 2003, Ms. Button graduated from the Community College of Southern Nevada with an Associate of Applied Science in Computing and Information Technology — ARC/INFO GIS (Geographic Information Systems).

18. In May 2006, Ms. Button graduated from the State University of New York, Cortland, with a Bachelor of Science in Geography & Geography Information Systems (GIS) Specialization (dual majors).

19. Ms. Button has worked with GIS for over eighteen years. She is a Geographic Information System/Computer-Aided Design (GIS/CAD) Specialist with strong analytical and diagnostic abilities, including cartography, transportation field analysis, geocoding, and digitized local government addresses.

20. From 2008 to 2017, Ms. Button concurrently served as an Adjunct GIS Instructor at the Rochester Institute of Technology, where she lectured on GIS fundamentals and taught college students Certified Geographic Information Systems Professional map-making projects.

**B. Initial Employment with NYSDOT**

21. On November 20, 2006, NYSDOT hired Ms. Button as an Engineering Technician ("ET") Grade 8 pursuant to New York Civil Service Law § 55-b, under the Governor's Program to Hire Individuals and Veterans with Disabilities. Ms. Button was subsequently assigned to Region 4 (Rochester area), where she has worked continuously since that time.

22. In this role, Ms. Button consistently demonstrated strong organizational skills and the ability to meet deadlines. Her responsibilities included attending meetings, preparing technical reports, creating project plans, and working closely with engineers and other stakeholders.

23. As a Deaf employee whose primary language is ASL, Ms. Button requires qualified ASL interpreters to communicate effectively during verbal interactions with hearing coworkers, supervisors, and stakeholders. This need is obvious and has been known to NYSDOT since the inception of her employment.

24. Ms. Button specifically requires qualified interpreters with familiarity in engineering terminology to accurately convey technical concepts and specialized engineering jargon. Without such interpreters, Ms. Button's knowledge and expertise cannot be accurately communicated, causing her supervisors and coworkers to wrongly perceive her as less competent.

**C. Defendant's Systematic Failure to Provide Effective Communication Access (2018–2024)**

25. From at least 2018 through the present, NYSDOT has systematically failed to provide Ms. Button with qualified ASL interpreters for workplace meetings, trainings, performance evaluations, and other verbal interactions essential to her employment.

26. From 2018 to 2019, NYSDOT forced Ms. Button to use her personal devices rather than company technology to access Video Remote Interpretation ("VRI").

27. NYSDOT also improperly directed Ms. Button to use Video Relay Service ("VRS") for in-person workplace communications. VRS is a free telecommunications relay service regulated by the Federal Communications Commission ("FCC") under 47 U.S.C. § 225 and 47 C.F.R. § 64.604, designed exclusively for telephone calls between a deaf person and a hearing person who are in different locations. VRS connects users through randomly assigned communications assistants who lack subject-matter expertise and cannot see both parties.

28. The FCC has categorically prohibited VRS from being used as a substitute for in-person interpreting. FCC Public Notice DA 05-2417 (September 7, 2005), published at 70 Fed. Reg. 59,346 (October 12, 2005), states unequivocally: VRS "may not be used as a substitute for an 'in-person' interpreter or a VRI service." The FCC specifically warned against entities using VRS "as a means to gain free 'in-person' interpreting services." NYSDOT nonetheless directed Ms. Button to use VRS for in-person workplace communications.

29. VRI, by contrast, is a fee-based service that must meet specific performance standards including real-time full-motion video without lags or blurry images, a sharply delineated image large enough to display the interpreter's face, arms, hands, and fingers, clear audible transmission, and adequate staff training. 28 C.F.R. § 36.303(f). Although this regulation governs VRI in the public accommodations context, its performance standards are widely recognized as the benchmark for effective VRI in all settings, including employment. At no point during the relevant period did NYSDOT provide Ms. Button with VRI services that met these performance standards.

30. Rather than arrange and pay for qualified in-person ASL interpreters or compliant VRI services, NYSDOT repeatedly directed Ms. Button to use free VRS—a service that costs

NYSDOT nothing because it is funded through the federal Telecommunications Relay Services Fund. NYSDOT maintained a contract with Geneva Worldwide for interpreter services, but routinely failed to coordinate interpreter availability for Ms. Button's scheduled workplace events.

**D. Specific Incidents of Accommodation Failure**

31. On December 10, 2018, MaryJo Andreas, a Program Aide, rescheduled a meeting for the morning of January 24, 2019, to discuss Ms. Button's role as the Asset Management and CHIPS Representative at the Ontario County Highway Superintendent's meeting. Ms. Andreas informed Cathrine O'Connor, a Senior Lead at Geneva Worldwide ("GWW"), NYSDOT's contracted interpreter services provider, of this change.

32. On January 23, 2019, Ms. O'Connor informed NYSDOT that the previously assigned interpreter, Rachel, would no longer be available and that GWW was having trouble finding a replacement. Ms. O'Connor also requested an agenda and supplemental materials to prepare a substitute interpreter, David, for the meeting.

33. Ms. Andreas and all other NYSDOT recipients of this email failed to respond to Ms. O'Connor's requests for materials.

34. On January 24, 2019, Ms. Button emailed Ms. O'Connor, Ms. Andreas, and Janet Graham to ask if David would attend. All NYSDOT recipients failed to address her concerns. In a separate message chain, conflicting information was communicated to Ms. Button regarding the proposed costs, transportation, and terms regarding the interpreters.

35. Because of NYSDOT's failure to coordinate interpreter services, no interpreters were present at the January 24, 2019, meeting. Much of the meeting time was spent discussing the

absence of an interpreter rather than the substantive agenda items. Ms. Button was unable to communicate with the participants.

36. On January 24, 2019, Christopher Sheridan, a member of the Region 4 Asset Management team, sent Ms. Button an email apologizing for the cancellation of the interpreters and acknowledging in writing that without essential interpretive support, Ms. Button was unable to optimally support customers and properly communicate her knowledge and expertise.

37. The interpreters provided by GWW through their contract with NYSDOT frequently provided ineffective communication support during work-related meetings. The GWW interpreters were often unqualified, unfamiliar with engineering terminology, and unable to accurately convey Ms. Button's technical knowledge.

38. On March 10, 2021, interpreters attended a meeting between Ms. Button and her supervisor. The interpreters were unqualified and had trouble following the conversation, forcing Ms. Button to repeat herself several times. The interpreters were unfamiliar with engineering terminology, failed to inform Ms. Button of changes and other relevant information, and overall, the communication during the meeting was ineffective.

39. On March 11, 2021, Ms. Button reported her grievances about the poor interpreting services she repeatedly received from GWW interpreters, which resulted from NYSDOT's poor planning.

40. Ms. Button received some email responses to her March 2021 complaint, but her concerns were not meaningfully addressed.

41. In connection with Ms. Button's March 2021 complaint, Maria Perez, Compliance Specialist II in NYSDOT's Office of Civil Rights, documented Ms. Button's concerns about

interpreter quality and explored alternative interpreter services, including Sorenson Interpreting Services. Despite NYSDOT's Office of Civil Rights being made aware of the problem at the departmental level, no systemic changes were implemented, and Ms. Button continued to receive inadequate interpreter services.

42. On December 22, 2022, Courtney Gould, Assistant Highway Design Engineer, contacted Ms. Button about her concerns with the interpreting services. Ms. Gould indicated that she was unaware of any incidents reported to management or the union and asked Ms. Button about the nature of her concerns.

43. Ms. Gould exchanged additional emails with Ms. Button between December 22, 2022, and January 19, 2023. Despite this correspondence, these issues remain unresolved. No concrete remedial action was taken in response to Ms. Button's concerns.

**E. Formal Accommodation Requests and Constructive Denials (2023–2024)**

44. On May 4, 2023, Ms. Button sent Lisa Schuster, NYSDOT's Administrative Services Director and Region 4 ADA Coordinator, a formal reasonable accommodation request, which included a completed Application to Request Reasonable Accommodation of a Disability and a NYSDOT Request for Reasonable Accommodation form.

45. The accommodations Ms. Button requested included: (a) the use of a video remote interpreter service; (b) open and closed captioning, including real-time voice and text captioning; and (c) a video camera on the computer or laptop to use Microsoft Teams chat, Zoom, or Webex when required to communicate with her supervisors or coworkers in general meetings.

46. Ms. Button indicated she required these accommodations because her ability to communicate was limited by NYSDOT's failure to provide qualified interpreters when timely

requested for meetings. NYSDOT did not meaningfully respond to this formal request, did not engage in a good-faith interactive process, and did not provide the requested accommodations or any effective alternative.

47. On June 5, 2023, Ms. Button authored a second reasonable accommodation letter to NYSDOT, requesting that her work environment be modified to allow for telecommuting to better facilitate her access to effective communication through video remote interpreting services, rather than rely on NYSDOT's repeated failures to provide qualified interpreters. Ms. Button attached a supplemental document explaining how video conferences allow for efficient communication between interpreters and participants.

48. Following Ms. Button's June 5 submission, Lisa Schuster responded on June 7, 2023, asking Ms. Button to clarify whether her accommodation request included hardware and software. Ms. Button replied the same day, directing Schuster to review the attached documents. On June 8, 2023, Thomas J. Button, a Design Quality Control Engineer, sent Ms. Button three specific follow-up questions regarding what hardware and software she required. Ms. Button responded the same morning, providing detailed answers: she would use her existing laptop, the Video Relay Service software (Convo VRS) was free to download, and she believed IT authorization would be required to install it. Ms. Button also noted that the quality of her laptop's built-in camera might need to be adjusted to support effective video communication. Despite receiving complete and specific answers to every question NYSDOT posed, NYSDOT took no further action. NYSDOT never authorized the software download, never addressed the camera issue, never offered any alternative accommodation, and never communicated any decision on the request.

49. On June 27, 2024, Ms. Button submitted a request to NYSDOT for an iPad because her phone screen was too small to clearly see the VRI interpreter. Ms. Button directed her request to Chandra Theetge, the Region 4 IT Requester responsible for addressing technological needs.

50. On the same day, Ms. Button's request was closed without approval. When Ms. Button inquired as to why, she was never given a substantive reason. Ms. Theetge informed Ms. Button that the ticket was closed because Ms. Button "did not wait for approval"—a circular justification that imposed a bureaucratic barrier on a straightforward disability accommodation request.

51. Ms. Button asked if the ticket could be reopened, emphasizing that an iPad was necessary for the VRI interpreter to provide effective communication. Ms. Theetge stated the ticket would be reopened only once Ms. Button received "permission," without specifying from whom permission was required, what process to follow, or what timeline applied.

52. The approval process that Ms. Theetge referenced was never communicated to Ms. Button in advance of her request. At no point prior to or after her iPad request did anyone at NYSDOT inform Ms. Button that a formal approval process existed for equipment requests, identify from whom "permission" was required, explain what criteria governed the decision, or provide any applicable timeline. By contrast, hearing employees at NYSDOT routinely receive standard equipment without comparable bureaucratic hurdles. For example, a hearing coworker named Aaron was provided a television screen at his desk. Laptops are routinely issued to employees performing field work outside the building, department-issued phones are provided to staff members on duty, and NYSDOT installed ceiling-mounted Wi-Fi specifically to support these devices for other employees. Ms. Button was not afforded comparable access to equipment necessary for her disability accommodation. The iPad request remains unresolved as of the date of this filing.

53. Upon information and belief, at the time of Plaintiff's June 27, 2024 iPad request, NYSDOT had no written policy requiring prior approval from a designated authority before standard IT equipment requests could be processed through the Region 4 IT office. Hearing employees in Region 4 routinely received laptops, department-issued phones, and other IT equipment through Ms. Theetge's office without being required to obtain undefined "permission" from unspecified authorities before their requests would be processed. No NYSDOT employee informed Ms. Button, before or after her request, of any written policy governing equipment requests, the identity of the approving official, the criteria for approval, or the timeline for a decision.

54. Throughout 2018–2024, Ms. Button made significant efforts to propose solutions and identify feasible ways to implement them. Her input was consistently ignored, delayed, or subjected to bureaucratic obstruction that functioned as a constructive denial of accommodation.

55. The conduct described in Paragraphs 25 through 53 above—including NYSDOT's failures to provide qualified ASL interpreters, its failures to engage in the interactive process, and its constructive denials of accommodation requests—occurred continuously and without interruption from 2018 through the present. At no point during this period did NYSDOT implement any systemic corrective measures to address Ms. Button's accommodation needs.

## F. Demotion and Systematic Denial of Promotions

56. When NYSDOT hired Ms. Button in 2006, she held a Section 55-b/c waiver under the Governor's Program to Hire Individuals and Veterans with Disabilities, pursuant to New York Civil Service Law §§ 55-b and 55-c. At that time, NYSDOT informed Ms. Button that the waiver could only be used once. However, subsequent executive policy under New York's Model Employer program extended waiver eligibility for both veterans and individuals with disabilities,

permitting them to take Civil Service examinations and be considered for promotional opportunities. NYSDOT did not inform Ms. Button of this change in eligibility until approximately eight years after its implementation, thereby depriving her of the opportunity to apply for promotional positions during that period. Once Ms. Button discovered that she was eligible to apply for positions such as Senior Engineering Technician and Transportation Analyst, she immediately did so.

57. In 2018, Ms. Button was promoted from Engineering Technician (ET) Grade 8 to Senior Engineering Technician ("SET") Grade 13 pursuant to a § 55-b appointment.

58. During her time in the SET position, Ms. Button received a "Needs Improvement" and then an "Unsatisfactory" performance rating. These ratings were the direct result of NYSDOT's failure to provide qualified interpreters with proficiency in civil engineering terminology. Without interpreters who could accurately convey her technical expertise, Ms. Button's supervisors and coworkers wrongly perceived her as less capable than she truly was. NYSDOT had known of Ms. Button's communication needs since the inception of her employment in 2006, yet failed to ensure adequate interpreter coverage during the probationary period that determined her career trajectory.

59. Ms. Button contested these inaccurate evaluations. She authored a letter detailing the issues with GWW's interpreting services and their direct impact on her performance. Her concerns were ignored.

60. In April 2019, Ms. Button received a negative performance report that was directly impacted by the unqualified interpretation services NYSDOT provided.

61. The purported performance deficiencies cited by NYSDOT in Ms. Button's 2018 and 2019 evaluations were the direct and foreseeable consequence of Defendant's failure to provide

effective communication access. During the evaluation period, NYSDOT failed to provide Ms. Button with qualified ASL interpreters who could accurately convey her technical knowledge of engineering concepts, causing her supervisors and coworkers to form an inaccurate assessment of her capabilities. Ms. Button's May 2023 performance evaluation—which occurred after she had greater access to communication tools—rated her performance as excellent.

62. On May 2, 2019, Ms. Button was demoted from SET Grade 13 back to ET Grade 8. This demotion was based on the performance evaluations described in Paragraphs 58 through 60 above, which were issued during the period in which NYSDOT failed to provide Ms. Button with qualified ASL interpreters.

63. On the same day as the demotion, Lisa Schuster, the ADA Coordinator, explained that NYSDOT wanted to wait to fill the SET position until after the examination on September 28, 2019, and that Ms. Button could reapply once scores were released approximately two to three months later.

64. Ms. Button inquired three separate times about promotion back to SET but never received an interview. On July 25, 2019, Ms. Schuster informed Ms. Button that no interviews had been conducted. On August 9, 2019, Ms. Button followed up again.

65. On March 11, 2021, Ms. Button inquired why she had not received an interview for the SET position. She received no substantive response. On August 31, 2021, Ms. Button applied again for the SET position. On November 9, 2021, she submitted yet another application for the same position.

66. In December 2021, pursuant to an agreement between the New York State Department of Civil Service and the Public Employees Federation ("PEF") union, all Engineering Technicians

were promoted to Senior Engineering Technician Grade 13. As a result of this agreement, Ms. Button was restored to the SET Grade 13 position she had lost due to NYSDOT's discriminatory demotion in May 2019. Ms. Button has held the SET Grade 13 title from December 2021 to the present. However, between May 2019 and December 2021—a period of approximately two and a half years—Ms. Button suffered lost wages and benefits at the lower ET Grade 8 pay scale as a direct result of Defendant's discriminatory demotion.

67. Pursuant to the Lilly Ledbetter Fair Pay Act of 2009, Pub. L. 111-2, § 5(b), an unlawful employment practice occurs with respect to discrimination in compensation each time wages, benefits, or other compensation is paid pursuant to a discriminatory compensation decision or other practice. Because NYSDOT paid Ms. Button at the lower ET Grade 8 rate—rather than the SET Grade 13 rate she would have received but for the discriminatory demotion—from May 2019 through December 2021, each such paycheck constituted a separate unlawful employment practice under Section 504. Ms. Button continued to receive paychecks at the depressed ET Grade 8 rate through December 2021. Moreover, because Ms. Button's current SET Grade 13 compensation reflects lost seniority, step increases, and retirement contributions attributable to the approximately two-and-a-half-year period at the lower grade, each paycheck she has received since December 2021—and each paycheck she continues to receive—carries forward the compensation effects of the discriminatory demotion.

68. On March 16, 2023, Ms. Button submitted her application for the Principal Engineering Technician ("PET") position. She followed all required procedures, responded to emails from Human Resources, and set up an appointment with an interpreter. She received a letter from Matthew Oravec but was not offered the position.

69. On May 15, 2023, Ms. Button applied again for the PET position. Jennifer Feeney confirmed receipt of her application. Ms. Button again followed all required procedures. She received a letter from Noel Kurth.

70. The PET posting explicitly stated: "Candidates must possess excellent verbal and written communication skills." Upon information and belief, other NYSDOT regions that posted the identical PET position did not include this language. NYSDOT knew that Ms. Button, a Deaf employee, would be the primary internal applicant for the Region 4 PET position.

71. On May 16, 2023, Ms. Button received her program evaluation, which acts as her performance review. On May 23, 2023, she received excellent reviews on her performance evaluation—demonstrating that her work product was fully satisfactory when her disability was not used as a basis for adverse evaluation.

72. A few weeks after Ms. Button applied for the PET position, NYSDOT Region 4 management retracted the original posting and replaced it with an identical posting that removed the prerequisite of "excellent verbal and written communication skills." No explanation was provided for the removal of this requirement.

73. On June 13, 2023, Ms. Button emailed Ms. Schuster to ask about any updates on her PET application. Ms. Schuster responded that the application was received and forwarded, and that they were waiting for the program area to complete their tasks.

74. On June 22, 2023, Ms. Button contacted Jennifer Feeney to express interest in the Senior Transportation Analyst position.

75. On June 26, 2023, Noel Kurth, Assistant Regional Design Engineer, emailed Ms. Button that no appointments had been made and that the position would need to be reposted, encouraging her to reapply.

76. On July 13, 2023, Ms. Button applied again for the PET position and exchanged response emails with Human Resources.

77. On July 14, 2023, Ms. Button contacted Colleen Williams, a former PEF Steward, via Microsoft Teams chat to ask if Ms. Williams had read the document from the PEF Labor and Management Meeting on April 13, 2023, which contained information about the vacancy for PET positions in the Design Group. Ms. Williams acknowledged that Ms. Button appeared to be "missing out on opportunities for promotion" and recommended contacting Collin Phillips, the PEF Field Representative. Ms. Button expressed that the situation was "very unfair" and described experiencing a "glass ceiling" in her career growth for years—a characterization that Ms. Williams did not dispute.

78. Ms. Button expressed concern that Mr. Phillips would not fully understand the years of discrimination and hardship she had experienced at NYSDOT. Ms. Williams offered no further response.

79. On August 16, 2023, Ms. Button was interviewed for the PET position.

80. During this interview, the interviewer inquired several times about Ms. Button's ability to use a telephone for communication. The interviewer undermined Ms. Button's communication abilities because of her deafness. The interviewer was unaware of VRS and VRI tools that could facilitate telephone-based conversations. These questions reflected discriminatory assumptions

about Ms. Button's ability to perform essential job functions and a failure to consider reasonable accommodations.

81. On August 25, 2023, Ms. Button received an email from Kayle Stettner, Assistant Regional Design Engineer, informing her that her application for the PET position had been rejected. This rejection came nine days after Ms. Button filed her EEOC Charge of Discrimination on August 16, 2023. The rejection email stated that her "application will be kept on file for consideration should additional positions become available."

82. On September 21, 2023—less than one month after NYSDOT rejected Ms. Button's PET application—Thomas J. Button, Design Quality Control Engineer, circulated an email summarizing a Squad Leader Meeting which stated: "No PET positions in the immediate future." This communication signaled that NYSDOT had no intention of offering further PET opportunities, effectively closing the door on Ms. Button's career advancement after rejecting her application.

83. New York Civil Service Law § 55-b authorizes the appointment of qualified persons with disabilities to positions in the competitive class without regard to any open-competitive or promotional eligible list. NYSDOT used this non-competitive pathway to hire Ms. Button in 2006 and to promote her to SET Grade 13 in 2018. NYSDOT interviewed Ms. Button for the PET positions through the § 55-b/c pathway despite her not appearing on the Civil Service eligible lists. NYSDOT did not inform Ms. Button of her eligibility to take promotional examinations under § 55-b for approximately eight years, as alleged above.

84. NYSDOT withheld information regarding Plaintiff's eligibility for the § 55-b promotional pathway for approximately eight years, as alleged in Paragraph 56 above. NYSDOT interviewed Ms. Button for the PET position despite her absence from the Civil Service eligible

list. Upon information and belief, NYSDOT has exercised discretion to appoint or promote hearing employees through provisional, temporary, or non-competitive pathways outside the standard Civil Service examination process during the relevant period. NYSDOT did not apply equivalent procedural requirements to those employees.

85. Upon information and belief, the SET and PET positions for which Ms. Button applied were filled by non-disabled individuals. Ms. Button has confirmed, based on a review of internal emails and the departmental organization chart, that the individuals selected for the positions she was denied were not individuals with disabilities.

86. On January 8, 2025, Ms. Button applied for the Transportation Analyst/Trainee position. Ms. Button was informed that her current title of Senior Engineering Technician does not permit a direct transfer to the Transportation Analyst position under Civil Service transfer rules. On June 22, 2023, Jennifer Feeney of NYSDOT Human Resources had explicitly confirmed in writing that "[t]here are not any titles that an SET SG 13 can transfer directly into," and that Ms. Button's only options were the § 55-b/c pathway or obtaining a PET promotion first. Because NYSDOT has repeatedly denied Ms. Button the PET promotion, she remains unable to pursue the Transportation Analyst career path.

**G. Retaliation for Protected Activity**

87. Throughout her employment, Ms. Button has engaged in protected activity by repeatedly requesting reasonable accommodations in the form of qualified ASL interpreters, filing formal accommodation requests, complaining to supervisors and management about inadequate interpreter services, and filing a Charge of Discrimination with the EEOC on August 16, 2023.

88. Following Ms. Button's protected activity, NYSDOT took the following adverse actions: (a) rejected her PET application on August 25, 2023—nine days after she filed her EEOC

Charge of Discrimination—despite her excellent May 2023 performance evaluation; (b) continued to fail to act on her outstanding formal accommodation requests of May 4, 2023, and June 5, 2023, which remained unresolved at the time of the EEOC filing and thereafter; and (c) obstructed her June 2024 iPad accommodation request, which was itself a form of protected activity.

89. Ms. Button's PET application was rejected on August 25, 2023—nine days after she filed her EEOC Charge of Discrimination on August 16, 2023.

90. Ms. Button filed her EEOC Charge on August 16, 2023, from the EEOC's Buffalo Local Office. Upon information and belief, NYSDOT was notified of Ms. Button's EEOC Charge through standard EEOC service procedures prior to August 25, 2023, and the individuals responsible for the PET hiring decision were aware of the Charge at or before the time the rejection was communicated to Ms. Button.

91. Before Ms. Button filed her EEOC Charge, NYSDOT had not rejected any of her promotion applications outright. Within nine days of the filing, NYSDOT rejected her PET application. After the filing, NYSDOT continued to fail to act on her formal accommodation requests and obstructed her iPad equipment request.

**H. Damages Suffered by Plaintiff**

92. The lack of communication access, repeated accommodation failures, discriminatory demotion, denial of promotions, and retaliation caused and continue to cause Ms. Button significant emotional distress, including anxiety, depression, and sleep disturbances.

93. Without effective communication access, Ms. Button has felt isolated, silenced, and discriminated against in her workplace.

94. Despite multiple complaints to NYSDOT's managerial staff, NYSDOT did not meaningfully respond to Ms. Button's concerns. NYSDOT was aware of Ms. Button's accommodation needs, received repeated written requests, and failed to take corrective action over a period of more than six years.

95. Upon information and belief, NYSDOT's last comprehensive ADA training for its staff was conducted in 2005 by the National Technical Institute for the Deaf at the Rochester Institute of Technology. Upon information and belief, from 2005 through at least 2023—a period of approximately eighteen years—NYSDOT failed to provide any structured ADA training program to educate its Region 4 supervisors and staff on their obligations to employees with disabilities, including the distinction between VRS and VRI, the requirements for qualified interpreters, and the interactive process for reasonable accommodations. This training failure is directly evidenced by the August 16, 2023 PET interview, during which the interviewer was unaware of VRS and VRI tools that could facilitate telephone-based conversations for Deaf employees.

96. As a direct result of the discrimination, retaliation, and hostile work environment described herein, Ms. Button has been under the continuous care of a licensed mental health professional since April 2019. Her treating clinician has documented that Ms. Button has experienced anxiety, depression, and sleep disturbances directly resulting from workplace stressors, as well as negative impacts on her relationships with colleagues and work productivity.

97. Ms. Button has suffered and continues to suffer lost compensation. During the period of her discriminatory demotion from May 2019 through December 2021, Ms. Button received the lower ET Grade 8 pay scale rather than the SET Grade 13 compensation to which she was entitled. Since then, Ms. Button has been denied the PET position and the opportunity to transfer to the Transportation Analyst position, resulting in ongoing lost compensation at those higher pay grades.

These losses constitute discrimination in compensation within the meaning of the Lilly Ledbetter Fair Pay Act of 2009, Pub. L. 111-2.

## CAUSES OF ACTION

### CLAIM I

### Violation of Section 504 of the Rehabilitation Act — Failure to Accommodate

98. Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 97 above as though fully set forth herein.

99. At all times relevant to this action, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, has been in full force and effect.

100. At all times relevant to this action, Plaintiff has been an individual with a disability within the meaning of 29 U.S.C. § 705(9)(B) and 42 U.S.C. § 12102(2), being substantially limited in the major life activities of hearing and speaking.

101. On March 28, 2024, the New York State Department of Civil Service confirmed Plaintiff's eligibility under the Governor's Program to Hire Individuals and Veterans with Disabilities (55-b and 55-c Program) pursuant to Section 55-b/c of the New York State Civil Service Law. This official state recognition of Plaintiff's qualifying disability further confirms Defendant's knowledge of Plaintiff's disability and its functional limitations throughout the relevant period.

102. At all times relevant to this action, Defendant has been a program or activity receiving federal financial assistance under 29 U.S.C. § 794(b), as specifically alleged above.

103. Section 504 provides that no "otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

104. Pursuant to 29 U.S.C. § 794(d), the standards for determining whether Section 504 has been violated in a complaint alleging employment discrimination are the standards applied under Title I of the ADA, 42 U.S.C. § 12111 et seq.

105. Defendant discriminated against Plaintiff by failing to provide reasonable accommodations for her known disability, including but not limited to: (a) failing to provide qualified ASL interpreters with engineering terminology proficiency for workplace meetings, trainings, and evaluations; (b) directing Plaintiff to use VRS in violation of FCC regulations rather than providing qualified interpreters or compliant VRI; (c) forcing Plaintiff to use personal devices for VRI access; (d) failing to engage in and complete a good-faith interactive process in response to Plaintiff's formal accommodation requests of May 4, 2023, and June 5, 2023; and (e) constructively denying Plaintiff's iPad accommodation request through bureaucratic obstruction.

## CLAIM II

### Violation of Section 504 of the Rehabilitation Act — Discrimination in Promotion and Terms of Employment

106. Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 105 above as though fully set forth herein.

107. Defendant discriminated against Plaintiff on the basis of her disability by: (a) demoting her from SET Grade 13 to ET Grade 8 on May 2, 2019, based on performance

evaluations tainted by NYSDOT's own failure to provide effective interpreter services; (b) denying her interviews and promotions to the SET position despite multiple applications in 2019, 2021, and thereafter; (c) denying her the PET position despite her excellent May 2023 performance evaluation; (d) including a discriminatory "excellent verbal and written communication skills" requirement in the Region 4 PET posting that was not included in identical postings for other regions; (e) subjecting her to a discriminatory interview on August 16, 2023, in which the interviewer repeatedly questioned her ability to use a telephone; and (f) blocking her ability to transfer to the Transportation Analyst position by repeatedly denying the PET promotion that is a prerequisite for such a transfer under Civil Service rules. Upon information and belief, the individuals selected for the SET and PET positions for which Ms. Button applied were non-disabled.

108. Defendant's failure to provide qualified ASL interpreters during the period described in Paragraphs 25 through 43 above prevented Ms. Button's supervisors and coworkers from accurately assessing her technical knowledge and expertise. Defendant then relied on performance evaluations conducted during this same period to demote Ms. Button and to deny her subsequent promotions.

109. Defendant's discrimination in promotion and terms of employment constitutes discrimination in compensation. The Lilly Ledbetter Fair Pay Act of 2009, Pub. L. 111-2, § 5(c)(1)(B), amended 29 U.S.C. § 794a(a)(2) to incorporate subsection (e)(3) of section 706 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(e)(3), into the remedies available to any person aggrieved by a violation of Section 504. Pursuant to § 2000e-5(e)(3), an unlawful employment practice occurs each time wages, benefits, or other compensation is paid pursuant to a discriminatory compensation decision or other practice. Each paycheck Ms. Button received at the

ET Grade 8 level during the period of her discriminatory demotion from May 2019 through December 2021, and each paycheck she continues to receive at the SET Grade 13 level rather than the PET level to which she would have been promoted but for NYSDOT's discrimination, constitutes a new violation.

## CLAIM III

### Violation of Section 504 of the Rehabilitation Act — Retaliation

110. Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 109 above as though fully set forth herein.

111. Section 504 prohibits retaliation against any individual who has engaged in protected activity. Section 504(d), 29 U.S.C. § 794(d), provides that "the standards used to determine whether this section has been violated in a complaint alleging employment discrimination . . . shall be the standards applied under title I of the Americans with Disabilities Act of 1990." Title I of the ADA, in turn, incorporates the anti-retaliation provision of 42 U.S.C. § 12203(a), which provides that no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by the ADA or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under that chapter. The implementing regulations of the Department of Transportation—the primary federal funding agency for NYSDOT—explicitly prohibit intimidatory or retaliatory acts against individuals who assert rights under Section 504. 49 C.F.R. § 21.11(e), incorporated into the DOT's Section 504 enforcement framework by 49 C.F.R. § 27.121(b).

112. Ms. Button engaged in protected activity by: (a) repeatedly requesting qualified ASL interpreters and other reasonable accommodations throughout 2018–2024; (b) formally

complaining about inadequate interpreter services in March 2021, December 2022–January 2023, and May–June 2023; and (c) filing a Charge of Discrimination with the EEOC on August 16, 2023.

113. Plaintiff's protected activity was not limited to her August 16, 2023 EEOC filing. Plaintiff engaged in protected opposition activity on multiple prior occasions, including: (a) on or about March 11, 2021, when Ms. Button submitted a written complaint to NYSDOT management opposing the inadequate and discriminatory interpreter services she had received, explicitly identifying the services as a failure of Defendant's legal obligations; (b) on or about December 22, 2022, through January 19, 2023, when Ms. Button corresponded with Courtney Gould raising concerns about NYSDOT's failure to provide effective communication access; (c) on May 4, 2023, when Ms. Button submitted a formal reasonable accommodation request; and (d) on June 5, 2023, when Ms. Button submitted a second formal accommodation request. Each of these communications put NYSDOT on notice that Ms. Button was opposing practices she believed to be discriminatory. Following these protected activities, NYSDOT failed to act on Ms. Button's accommodation requests, denied her interviews for the SET position, and ultimately rejected her PET application—adverse actions occurring in temporal proximity to the protected conduct.

114. Following Ms. Button's protected activity, Defendant took adverse actions against her, including: (a) rejecting her PET application on August 25, 2023, nine days after her EEOC filing; (b) continuing to fail to act on her outstanding formal accommodation requests; and (c) obstructing her June 2024 iPad accommodation request.

115. Ms. Button's PET application was rejected nine days after her EEOC filing. Prior to the EEOC filing, NYSDOT had not rejected any of Ms. Button's promotion applications; instead, NYSDOT had either failed to respond or encouraged her to reapply. Defendant has offered no legitimate, nondiscriminatory reason for the PET rejection.

**CLAIM IV**

**Violation of the New York State Human Rights Law**

116. Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 115 above as though fully set forth herein.

117. At all times relevant to this action, the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq., has been in full force and effect and has applied to Defendant's conduct.

118. At all times relevant to this action, Plaintiff has had a disability within the meaning of N.Y. Exec. Law § 292(21).

119. At all times relevant to this action, Defendant has been an employer within the meaning of N.Y. Exec. Law § 292(5).

120. Defendant violated N.Y. Exec. Law § 296(1)(a) by discriminating against Plaintiff in the terms, conditions, and privileges of employment because of her disability, including failing to provide reasonable accommodations, demoting her, and denying her promotions.

121. Defendant violated N.Y. Exec. Law § 296(1)(h) by subjecting Plaintiff to inferior terms, conditions, and privileges of employment because of her disability, including the systematic failure to provide effective communication access.

122. Defendant violated N.Y. Exec. Law § 296(3)(a) by failing to make reasonable accommodations for Plaintiff's known disability in the workplace, including failing to provide qualified ASL interpreters and failing to engage in a good-faith interactive process to identify effective accommodations.

123. Defendant violated N.Y. Exec. Law § 296(1)(e) by retaliating against Plaintiff because she opposed discriminatory practices and filed a charge of discrimination.

124. Plaintiff's NYSHRL claims are brought pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367. Should Defendant consent to this Court's exercise of jurisdiction over these claims, Plaintiff is prepared to litigate all claims in a single proceeding. Should this Court determine that the Eleventh Amendment bars Plaintiff's NYSHRL claims in federal court, Plaintiff respectfully requests that such claims be dismissed without prejudice to their pursuit in New York State court. Plaintiff reserves all rights to pursue NYSHRL claims in New York State Supreme Court or the Court of Claims, with reservation of all remedies available under this statute,

**DAMAGES**

125. Pursuant to 29 U.S.C. § 794a(a)(2), as amended by the Lilly Ledbetter Fair Pay Act of 2009, Pub. L. 111-2, § 5(c)(1)(B), the remedies, procedures, and rights set forth in Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., and in subsection (e)(3) of section 706 of such Act, 42 U.S.C. § 2000e-5(e)(3), applied to claims of discrimination in compensation, shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance under Section 504. Additionally, pursuant to 29 U.S.C. § 794a(a)(1), as amended by Pub. L. 111-2, § 5(c)(1)(A), the remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, including the application of sections 706(f) through 706(k), 42 U.S.C. § 2000e-5(f) through (k), and the application of section 706(e)(3), 42 U.S.C. § 2000e-5(e)(3), to claims of discrimination in compensation, shall be available with respect to complaints under the Rehabilitation Act.

126. Plaintiff has suffered and continues to suffer the following damages as a direct and proximate result of Defendant's unlawful conduct: (a) lost wages and benefits, including the differential between her ET Grade 8 compensation and the SET Grade 13 compensation she would

have received during the period of her discriminatory demotion from May 2019 through December 2021, and the differential between her current SET Grade 13 compensation and the PET compensation she would have received but for Defendant's discrimination; (b) emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life; (c) anxiety, depression, and sleep disturbances; (d) humiliation, isolation, and dignitary harm resulting from systematic exclusion from effective workplace communication; and (e) loss of professional development and career advancement opportunities, including the inability to transfer to the Transportation Analyst position.

127. Section 504(d), 29 U.S.C. § 794(d), provides that the standards for determining whether Section 504 has been violated in an employment discrimination complaint shall be the standards applied under Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111 et seq. Title I of the ADA, through 42 U.S.C. § 12117(a), incorporates the powers, remedies, and procedures set forth in sections 706 and 707 of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-5 and 2000e-6. Pursuant to 42 U.S.C. § 1981a(a)(2), in an action brought under the powers, remedies, and procedures set forth in section 706 or 717 of the Civil Rights Act of 1964, as provided in section 505(a)(1) of the Rehabilitation Act of 1973, 29 U.S.C. § 794a(a)(1), a complaining party may recover compensatory and punitive damages as allowed in § 1981a(b). Section 1981a(b)(3) provides that compensatory damages include future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses. The Lilly Ledbetter Fair Pay Act of 2009, Pub. L. 111-2, § 5(c)(1)(B), further amended 29 U.S.C. § 794a(a)(2) to incorporate subsection (e)(3) of section 706 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(e)(3), into the remedies available to any person aggrieved by a violation of Section 504 by a recipient of federal assistance. Additionally, 42 U.S.C. § 2000d-

7(a)(2) provides that remedies, including remedies both at law and in equity, are available for a violation of Section 504 in a suit against a State to the same extent as such remedies are available in a suit against any public or private entity other than a State. Plaintiff seeks compensatory damages, including damages for emotional pain, suffering, mental anguish, and loss of enjoyment of life, pursuant to these provisions.

128. Plaintiff does not seek punitive damages against Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter a declaratory judgment that Defendant violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq., by failing to provide Plaintiff with effective communication access, reasonable accommodations, and equal employment opportunities;

B. Enter a permanent injunction requiring Defendant to:

(i) provide Plaintiff with qualified ASL interpreters possessing proficiency in engineering and technical terminology for all workplace meetings, trainings, performance evaluations, and other employment-related events requiring verbal communication, with no fewer than five (5) business days' advance scheduling absent exigent circumstances;

(ii) engage in a timely, documented, good-faith interactive process with Plaintiff to identify and implement effective accommodations, including responding in writing to any accommodation request within fourteen (14) calendar days;

(iii) evaluate Plaintiff for promotion to a position commensurate with her qualifications and experience, using performance criteria that account for and do not penalize the effects of Defendant's prior accommodation failures;

(iv) conduct annual training for all Region 4 supervisors, managers, and human resources personnel on their obligations under Section 504 and the ADA with respect to deaf and hard of hearing employees, including the distinction between VRS and VRI, the requirements for qualified interpreters, and the interactive process;

(v) adopt and implement a written effective communication policy for deaf and hard of hearing employees that establishes clear procedures for requesting and obtaining qualified interpreter services, designates a responsible official, and provides for documented tracking of all accommodation requests and responses;

(vi) immediately cease directing deaf employees to use Video Relay Service for in-person workplace communications, in compliance with FCC Public Notice DA 05-2417; and

(vii) provide Plaintiff with NYSDOT-issued equipment, including an iPad or equivalent device, sufficient to access Video Remote Interpreting services with the image quality and screen size required by 28 C.F.R. § 36.303(f);

C. Order Defendant to promote Plaintiff to the Principal Engineering Technician position, or such higher position as she would have attained but for Defendant's discrimination, with full restoration of seniority, benefits, and retirement contributions;

D. Award Plaintiff compensatory damages, including for emotional pain, suffering, mental anguish, and loss of enjoyment of life, pursuant to 29 U.S.C. § 794a(a)(1) and (a)(2), 42 U.S.C. § 1981a, 42 U.S.C. § 2000e-5(e)(3), and 42 U.S.C. § 2000d-7(a)(2);

E. Award Plaintiff back pay representing the difference between her actual compensation and the compensation she would have received at the SET Grade 13 level during the period of her discriminatory demotion (May 2019 through December 2021) and at the PET level thereafter, together with front pay, prejudgment interest, and post-judgment interest;

F. Award Nominal Damages;

G. Award Plaintiff reasonable attorneys' fees, costs, and disbursements;

H. Retain jurisdiction over this action to monitor Defendant's compliance with any injunctive relief for a period of not less than three (3) years; and

I. Award such other and further relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: February 12, 2026

Respectfully submitted,

Andrew Rozynski, Esq.
EISENBERG & BAUM, LLP
24 Union Square East, PH
New York, NY 10003
(212) 353-8700
arozynski@eandblaw.com